# In the United States Court of Federal Claims

No. 09-152L

(Filed:  December 19, 2011)
_____

| | |
|---|---|
| CAROLINA PLATING WORKS, INC., Individually for Itself and As Representatives of a Class of Similarly Situated Persons, <br><br>         Plaintiffs, <br><br>   v. <br><br> THE UNITED STATES, <br><br>         Defendant. | Class action; Rails-to-Trails Act – takings; Cross-motions for partial summary judgment; Standard for determining just compensation; "Before" value of property; Timing of takings; Abandonment – controlled by state law (South Carolina); Existence of genuine issues of material fact preclude judgment, as a matter o f law, on whether abandonment of rail line occurred before alleged takings. |

_____

## OPINION
_____

*Steven Mathew Wald,* Baker Sterchi Cowden & Rice, L.L.C., St. Louis, MO, for plaintiffs.

*Peter Christopher Whitfield*, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Ignacia S. Moreno*, for defendant.

**ALLEGRA, Judge:**

Plaintiffs are landowners in South Carolina, who allege that their property was taken as a result of the application of the Rails-to-Trails Act, 16 U.S.C. §§ 1241-51 (2006).  The court certified a class on October 28, 2009.  Pending are the parties' cross-motions for partial summary judgment regarding how just compensation should be calculated in this matter.  Those motions have been fully briefed and argued.  For the reasons that follow, the court concludes that the existence of genuine issues of material fact precludes it from granting either party's motion.

## I.     BACKGROUND

The class of plaintiffs in this case own real estate that underlies or abuts an approximately 11.8-mile railroad corridor extending from milepost 0.0 in Greenville, South Carolina, to milepost 11.8 in Travelers Rest, South Carolina.   Prior to May of 1999, the railway was owned by the Carolina Piedmont Division of the South Carolina Central Railroad (SCCR) company.   In late May of 1999, SCCR sought and received from the Surface Transportation Board (STB) authority to abandon the railroad line that included the track in question.[1]   But, SCCR apparently never exercised this authority and instead sold the line to Greenville County Economic Development Corporation (GCEDC) for $1.3 million.

On June 24, 2005, GCEDC filed a petition for exemption with the STB, seeking permission to abandon the railway line in question.   The parties have stipulated that on July 27, 2005, Upstate Forever, a non-profit, trail operator, filed a request for the issuance of a Notice of Interim Trail Use (NITU).[2]   On October 12, 2005, the STB issued the requested NITU for the line.   On September 26, 2006, GCEDC entered into a trail use agreement with the Greenville County Recreation District (GCRD), pursuant to which the property is to be used as a public recreational trail and possible future use as a corridor for a tram.

---

[1]   The Surface Transportation Board (STB) has exclusive authority over all the nation's rail lines.   *See Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981).   A railroad cannot terminate rail service on a particular line without first getting the STB's consent. *See Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006).

[2]   The record is somewhat ambiguous as to whether the request for a NITU was filed by Upstate Forever or by GCEDC.   The parties have made competing proposed findings of uncontroverted fact in this regard – but each agrees with the other's finding in this regard.

There are three ways to terminate rail service.   First, a railroad can apply to the STB for permission to discontinue service.   *See* 49 U.S.C. § 10903(d)(2).   Second, a railroad can ask the STB for permission to abandon the rail line through a proceeding.   *See* 49 U.S.C. § 10903(d)(1). Finally, under the Rails-to-Trails Act, a railroad can terminate service through a process known as "railbanking."   Under the railbanking process, the railroad must first file an abandonment application under 49 U.S.C. § 10903, or a Notice of Exemption from that process under 49 U.S.C. § 10502.   Once the railroad receives authorization, a third-party asks the STB for a NITU so that the former railway can be used for interim trail use.   The interim trail is subject to the "possible future reconstruction and reactivation of the right-of-way for rail service."   49 C.F.R. § 1152.29(a)(1)-(3).   The NITU gives the railroad 180 days in which to negotiate an interim trail use agreement with the third-party trail sponsor.   49 C.F.R. § 1152.29(d)(1).   If an agreement is reached, then the trail sponsor manages the right-of-way, subject to a possible future restoration of rail service; if an agreement is not reached, the railroad may exercise its authority to abandon the line.   49 C.F.R. §§ 1152.29(d)(1) and (e)(2).

On March 11, 2009, plaintiffs filed a complaint in this court alleging an uncompensated taking. They alleged that under South Carolina law, the easement was abandoned when the GCEDC ceased operating a railroad over plaintiffs' property. The subsequent use of the easement as a recreational trail, they aver, constitutes an uncompensated taking. Following the certification of the class, the parties entered into settlement talks. Those talks have progressed in good faith, with the parties agreeing to undertake a joint appraisal designed to measure the value of the property interest plaintiffs allege that defendant has taken in this case. For purposes of this calculation, the United States has stipulated that, as to fourteen property owners, a taking occurred on October 12, 2005 – the date the STB issued the NITU.[3] The parties, however, disagree as to the standard for measuring just compensation. Accordingly, on March 25, 2011, plaintiffs filed a motion for partial summary judgment regarding the methodology to determine just compensation. On April 15, 2011, the defendant filed its response to plaintiffs' motion for partial summary judgment and a cross-motion for partial summary judgment as to the just compensation issue. Briefing and argument of these cross-motions has now been completed.

## II.   DISCUSSION

We begin with common ground. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Id.* at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When making a summary judgment determination, the court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. Immigration & Naturalization Serv.*, 436 U.S. 748, 756 (1978) ("a [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). The court must determine whether the evidence presents a disagreement sufficient to require fact finding, or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *see also Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita*, 475 U.S. at 587)). Where there is a genuine dispute, all facts must be construed, and all inferences drawn from the evidence must be viewed, in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587–88 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *L.P. Consulting Grp., Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

---

[3] On December 16, 2010, the court granted plaintiffs' motion to dismiss the claims of certain plaintiffs without prejudice.

Where, as here, a court rules on cross-motions for summary judgment, it must view each motion, separately, through this prism.[4]

The parties have stipulated that the takings here occurred upon the issuance of the NITU, that is, on October 12, 2005.  That view accords with a long line of Federal Circuit precedents, which holds that the issuance of the NITU triggers the takings.  *See Ladd v. United States*, 640 F.3d 1015, 1023-24 (Fed. Cir. 2010); *Bright v. United States*, 603 F.3d 1273, 1276 (Fed. Cir. 2010); *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006); *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004).  As these cases explain, it is the issuance of the NITU, and not some later or earlier action in the nature of physical possession, that is the governmental act which blocks the state reversion property interest and thereby effectuates the takings.  *Ladd*, 630 F.3d at 1023 ("The NITU is the government action that prevents the landowner from possession of their property unencumbered by the easement."); *Caldwell*, 391 F.3d at 1233-34 ("The issuance of the NITU is the only ***government*** action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.") (emphasis in original).

At issue is how to determine the just compensation owed for such a takings.  Plaintiffs argue that the easements in question would have extinguished under state law by reason of permitting use of the easement as a recreational trail, but for the Rails-to-Trails Act.  Plaintiffs assert that but for the Rails-to-Trails Act, they would have regained use of their land unencumbered by any easement.  It follows, they contend, that the proper measure of damages is the difference between the value of the property in question unencumbered by any easements and its value subject to a perpetual trail easement.  Defendant remonstrates that the railroad did not abandon the easements in question, that those easements remained in place, and that the damages owed here are the difference between the value of the property subject to a rail easement and its value subject to a trails easement.  As can be seen, then, the parties disagree as to how to calculate the "before" value of the property in question – that is, the value of the property before the takings in question.

So what was the property interest owned by the plaintiffs at the time that the STB issued the NITU?  Congress passed the Rails-to-Trails Act to preserve unused railway rights-of-way for future use, or "railbank" them, by using them as recreational trails.  *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 5-8 (1990) (*Preseault I*); *see also Barclay*, 443 F.3d at 1371 ("[T]he purpose of the Trails Act was to preserve unused railroad rights-of-way by converting them into recreational trails.").  If a state, municipality, or private group is willing to assume financial and managerial responsibility for the right-of-way, the railroad must transfer the right-

---

[4]  *See Chevron U.S.A., Inc. v. Mobil Producing Tex. & N. Mex.*, 281 F.3d 1249, 1252-53 (Fed. Cir. 2002); *see also Estate of Hevia v. Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc.*, 598 F.3d 257, 264 (6th Cir. 2010); *Stovall v. United States*, 94 Fed. Cl. 336, 344 (2010); *Northrop Grumman Computing Systems, Inc. v. United States*, 93 Fed. Cl. 144, 148 (2010).

of-way to it for trail use, rather than abandon it.  16 U.S.C. § 1247(d).  In the Rails-to-Trails Act, Congress provided that conversions to trail use that were subject to reactivation of rail service on the route did not constitute abandonment.  *Id*. ("[I]n the case of interim use . . . if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.").  Of course, nothing in the Rails-to-Trails Act precludes a finding that a railroad abandoned its right-of-way before the conversion to a trail, irrespective of the statute.  *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1372 (Fed. Cir. 2009).

In *Preseault I*, the Supreme Court held that if a conversion to a trail gives rise to a taking, compensation is available under the Fifth Amendment.  494 U.S. at 4-5.  The Court, however, hastened to add that "under any view of takings law, only some rail-to-trail conversions will amount to takings . . . .  Others are held as easements that do not even as a matter of state law revert upon interim use as nature trails."  *Id*. at 16.  The Court declined to decide whether a taking had occurred.  *Id*. at 17.  Preseault then brought a claim in this court for a taking.  Deciding an appeal in that case *en banc*, the Federal Circuit eventually laid out a framework for deciding takings liability in cases arising under the Rails-to-Trails Act.  *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (*Preseault II*).  As recently explained by the Federal Circuit, that framework has three prongs:

> Under *Preseault II*, the determinative issues for takings liability are (1) who owns the strip of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate; (2) if the railroad acquired only an easement, were the terms of the easement limited to use for railroad purposes, or did they include future use as a public recreational trail (scope of the easement); and (3) even if the grant of the railroad's easement was broad enough to encompass a recreational trail, had this easement terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement (abandonment of the easement).  100 F.3d at 1533.

*Ellamae Phillips*, 564 F.3d at 1373; *see also Dana R. Hodges Trust v. United States*, 2011 WL 5042383, at *5 (Fed. Cl. Oct. 25, 2011).  In *Preseault II*, the Federal Circuit held that whether an abandonment has occurred is a question of "fact, and the fact that question relates to a right of way taken by a railroad company does not make it one of law."  100 F.3d at 1546 (internal citations omitted).

In determining whether an easement holder abandoned its interest, courts are obliged to apply state law.  *See Preseault I*, 494 U.S. at 22 (O'Connor, J., concurring) (explaining that railbanking "do[es] not displace state law as the traditional source of the real property interests").  Pursuant to South Carolina law, "[t]he primary elements of abandonment are the intention to abandon and the external act by which the intention is carried into effect."  *Holly Hill Lumber Co. v. Grooms*, 198 S.C. 118, 16 S.E.2d 816, 821 (S.C. 1941); *see also Eldridge v. Greenwood*, 388 S.E.2d 247, 250-51 (S.C. Ct. App. 1989) ("The doctrine of abandonment as it relates to railroads . . . includes both the intention to abandon and the external act by which such intention

is carried into effect.").   In this regard, "[t]he intention to abandon is considered the first and paramount inquiry." *Holly Hill Lumber*, 16 S.E.2d at 821 (citation and internal quotation marks omitted); *see also Raulerson v. United States*, 99 Fed. Cl. 9, 11 (2011).   Showing that the second prong of this test – requiring an external act – is satisfied requires proof that there are "acts and conduct [that are] positive, unequivocal and inconsistent with the claims of title." *Eldridge*, 388 S.E.2d at 251.   An intention to abandon must be concurrent with an act demonstrating this intent. *Id.* ("There must be a concurrence of the intention with the actual relinquishment of the property.").   Both prongs of this abandonment test, moreover, must be shown "by clear and unequivocable evidence." *K&A Acquisition Group, LLC v. Island Pointe, LLC*, 682 S.E.2d 252, 259 (S.C. 2009) (citing *Carolina Land Co. v. Bland*, 265 S.C. 98, 109, 217 S.E.2d 16, 21 (1975)).

Contrary to plaintiffs' claim, under South Carolina law, mere "nonuse" of the railway does not effectuate an abandonment.   *See K&A Acquisition Group*, 682 S.E.2d at 259 ("mere discontinuance [of use] is not sufficient to prove abandonment"); *Saluda Motor Lines, Inc. v. Crouch*, 386 S.E.2d 290, 292 (S.C. Ct. App. 1989) ("[L]apse of time and nonuser alone is not sufficient to establish abandonment") (citations omitted); *see also Wilson v. Greenville Cty.*, 96 S.E. 301, 302 (S.C. 1918) (recognizing that discontinuance of a public highway and abandonment are two acts which are "separate and distinct in fact and in law").   Rather, the intent to abandon a railway must be accompanied by other external acts designed to carry that intention into effect, such as the dissolution of the rail company or the sale of certain of the parcels that constitute the railway.   *See Eldridge*, 388 S.E. 2d at 251; *Saluda Motor Lines*, 386 S.E. 2d at 292.   That the law may be different in other states is of no moment.   *Compare Ybanez v. United States*, 2011 WL 6016979 (Fed. Cl. Dec. 5, 2011) (applying Texas law); *Gregory v. United States*, 2011 WL 4863897, at *20 (Fed. Cl. Oct. 12, 2011) (applying Mississippi law); *Anna F. Nordhus Family Trust v. United States*, 98 Fed. Cl. 331, 337-38 (2011) (applying Kansas law); *Dana R. Hodges Trust*, 2011 WL 5042383, at *10 (applying Michigan law).

In the court's view, the existence of genuine issues of material fact precludes the court from determining, as a matter of South Carolina law, that the railroad easements on the properties in question were abandoned prior to the alleged takings here, so as to leave plaintiffs' property unencumbered as of the time of the issuance of the NITU.   In their filings, the parties have provided the court only with second-hand details regarding the nature of the property interests impacted here and what the two institutional holders of the easements (SCCR and GCEDC) did prior to the issuance of the NITU here.   In particular, there is conflicting evidence as to whether the 1999 transfer of the railway from SCCR to the GCEDC evidenced an intent to abandon the railway or instead constituted a means to maintain that same right-of-way for rail use.   Further evidence is required to bring these matters into focus, particularly given the clear and convincing standard outlined above.   In these circumstances, the court concludes that neither party is entitled to partial summary judgment as a matter of law.   *See Eldridge*, 388 S.E. 2d at 250 ("The question of whether a railroad has abandoned its right-of-way is ordinarily a question of fact."); *Lorick & Lowrance, Inc. v. Southern Ry. Co.*, 87 S.C. 71, 74, 68 S.E. 931 (1910) (same); *see also Preseault II*, 100 F.3d at 1546.

In seeking to convince the court otherwise, plaintiffs assert that the conversion of the former railway into a recreational trail, *a fortiori*, effectuated the abandonment of the easements under South Carolina law.  But, this argument essentially puts the cart before the horse.  *Inter alia*, it not only ignores the fact that the conversion of the properties in question to trail use occurred **after** the issuance of the NITU, but also that this conversion might not have occurred at all but for the prior issuance of the NITU pursuant to the Rails-to-Trials Act.  As such, the conversion to trail use thus can hardly be considered in a compensation calculus that starts by assessing the value of the properties involved "before" the takings.[5]

This court's recent decision in *Ybanez*, 2011 WL 6016979, is not to the contrary.  In that case, this court held that, under Texas law, the railroad in question had abandoned the easements in question before the NITU was issued and, on that basis, found that the "before" state of the property was unencumbered.  It was for this reason that the court held that "[b]ut for the NITU and subsequent trail use agreement, plaintiffs would have had fee title to their land unburdened by the railroad easement."  *Id.* at *4.  The same can be said of this court's recent decision in *Raulerson*, which, though involving South Carolina law, still dealt with a situation where the railbanking agreement in question preceded the issuance of the NITU.  *Raulerson*, 99 Fed. Cl. 10.[6]  Such is not the relevant chronology here, leaving open the question whether the abandonment preceded the alleged takings in question.

---

[5] It is arguable that had plaintiffs' property not been allegedly taken, it would have remained subject to the railway easements for some term of years, if not indefinitely.  Seemingly, plaintiffs should not be permitted to take advantage of events that would not have occurred but for the takings.  In some ways, the situation presented is reminiscent of the so-called *Miller* Doctrine, under which the owner of property may not obtain an enhanced value for his taken lands based on their potential use in the project for which they are to be taken.  *See Miller*, 317 U.S. at 379; *see also United States v. Reynolds*, 397 U.S 14, 18 (1970); *John B. Hardwicke Co. v. United States*, 467 F.3d 488, 490 (Ct. Cl. 1972) ("According to this doctrine, a condemnor need not compensate a landowner for value which the condemnor creates by the establishment of the project for which the landowner's land is condemned.").  As under this doctrine, plaintiffs seemingly are not entitled to any enhancement in value associated with an action that would not have occurred but for the taking.  On the other hand, the court does not wish to foreclose the possibility that the value of the property before the taking would reflect not a permanent railroad easement, but rather an easement that would soon be abandoned.  Conceivably the latter fact might impact the compensation calculus.

[6] To the extent that either *Ybanez* or *Raulerson* can be read as suggesting that, in calculating the value of property allegedly taken under the Rails-to-Trails, the property should always be treated as being unencumbered, this court respectfully disagrees.  *See United States v. Miller*, 317 U.S. 369, 373 (1943) ("The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken.").

**III.    CONCLUSION**

While this court might ultimately conclude that, under South Carolina law, the railway in question was abandoned prior to the alleged takings here, the evidence at this point is too unsettled to allow the court to reach that conclusion as a matter of law.  Based on the foregoing, plaintiffs' motion for partial summary judgment and defendant's cross-motion for partial summary judgment are both hereby **DENIED**.  On or before January 13, 2012, the parties shall file a joint status report indicating how this case should proceed, with a proposed schedule, as appropriate.  Following the receipt of that report, the court will schedule a status conference with the parties to determine the best course for resolving this matter in the most expeditious fashion.

**IT IS SO ORDERED**.


s/ Francis M. Allegra
Francis M. Allegra
Judge